IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRIAN D'ALFONSO | : | NO. 03-746 |

<u>**MEMORANDUM**</u>

**Padova, J.**                                                     **April 15, 2008**

        Brian D'Alfonso has filed a motion pursuant to 28 U.S.C. § 2255, asserting ineffective assistance of trial counsel and prosecutorial misconduct. Pursuant to a written plea agreement, D'Alfonso pled guilty on May 4, 2004, to sixteen counts of mail fraud and four counts of selling unregistered securities. As part of that agreement, D'Alfonso waived certain rights to bring a § 2255 motion. The Government responded to the § 2255 motion by filing a motion to dismiss. Because D'Alfonso raised factual issues concerning his knowledge of the plea agreement's waiver provision, we appointed counsel and conducted an evidentiary hearing. For the following reasons, we find that D'Alfonso voluntarily and knowingly waived his right to bring a § 2255 motion. Accordingly, we grant the Government's motion.

**I.       PROCEDURAL HISTORY**

        On November 6, 2003, D'Alfonso was charged with 16 counts of mail fraud, in violation of 18 U.S.C. § 1341, and 4 counts of sale of unregistered securities, in violation of 15 U.S.C. § 77e(a)(2). The indictment alleged that D'Alfonso devised a scheme to defraud investors and to obtain money and property under false pretenses. Specifically, the indictment charged that D'Alfonso encouraged clients of First Montauk Securities to invest in Tech-Vest, Inc., a business

purported to be operated by D'Alfonso.  D'Alfonso allegedly promised investors a false annual rate

of return, and also falsely informed them that Tech-Vest was an on-line trading business affiliated

with First Montauk Securities, that their investments would be protected with insurance, and that

their principal payment would be returned whenever it was requested.  As part of the scheme, the

indictment charged that D'Alfonso sent the investors stock certificates, other documents, and

dividend checks by United States mail and Federal Express.

On May 4, 2004, the Court conducted a Change of Plea Hearing.  After questioning

D'Alfonso regarding his willingness to plead guilty and his understanding of his Plea Agreement,

and finding that he was competent to enter the plea, that the guilty plea was voluntary, and that there

was a factual basis for the plea, we accepted his guilty plea.  (N.T. May 4, 2004 at 23).  On February

1, 2005, D'Alfonso was sentenced to a term of 60 months imprisonment.  Thereafter, D'Alfonso

filed an appeal to the United States Court of Appeals for the Third Circuit, which was dismissed

based on the Government's motion to enforce D'Alfonso's waiver of appellate rights.

D'Alfonso subsequently filed the pending pro se motion pursuant to 28 U.S.C. § 2255, along

with a Memorandum of Law contending that he received ineffective assistance of counsel during the

plea proceeding, as well as asserting claims of prosecutorial misconduct.[1]  The Government filed the

instant Motion to Dismiss on December 10, 2007, asking us to enforce D'Alfonso's waiver of the

right to collaterally attack his conviction.  D'Alfonso filed a response on December 24, 2007.  On

April 3, 2008, the Court conducted an evidentiary hearing on D'Alfonso's claim that the plea

agreement waiver was unknowing and involuntary.  We make the following findings of fact and

---

[1]D'Alfonso claims that the prosecutors knowingly permitted perjury before the grand jury
and failed to disclose that two grand jury witnesses were convicted drug dealers and that one was
a suspect in an unsolved homicide.  He also asserts that these actions constituted fraud on the court.

conclusions of law.

## II.   FINDINGS OF FACT

1      The Plea Agreement D'Alfonso signed contained the following provision:

> In exchange for the undertakings made by the government in entering
> this plea agreement, the defendant voluntarily and expressly waives
> all rights to appeal or collaterally attack the defendant's conviction,
> sentence, or any other matter relating to this prosecution, whether
> such a right to appeal or collateral attack arises under 18 U.S.C. §
> 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of
> law.

(Plea Agreement at 4).

2      D'Alfonso testified that, at the time he entered his guilty plea and signed the Plea Agreement,
he did not understand that he was waiving his appellate and collateral review rights.  He testified that
his trial counsel, Benjamin Cooper, with whom he met only twice prior to the plea hearing, told him
that the Government's plea offer was a good deal and that he should take it, but did not discuss the
waiver provision or the facts contained in the plea agreement.   (NT 4/4/08 at 11.)  He testified that
Cooper never told him that the plea agreement contained a waiver of his appellate and collateral
attack rights.  (Id. at 24.)

3      D'Alfonso testified at the evidentiary hearing that he had limited contact with Cooper prior
to the entry of his guilty plea on May 4, 2004.  He testified that he first met Cooper one month after
his preliminary hearing.   At that meeting, he gave Cooper three audio tapes that he contended
implicated two of his employees, Eugene Carpino and Gabriel Santosussa, in thefts from a jewelry
store he owned, which he contended could serve as an explanation for why money was missing.  (Id.
at 11.)  The meeting, which lasted approximately one hour, involved reviewing evidence that Cooper
had received from the Government.  (Id. at 12.)  D'Alfonso testified that he urged Cooper to hire a

forensic accountant to assist his defense.  (Id. at 13.)  He also testified that he never discussed the possibility of entering a guilty plea at that meeting.  (Id. at 13-14.)

4      D'Alfonso testified that the next meeting he had with Cooper was scheduled because the Assistant United States Attorney wanted to talk about a possible plea.  (Id. at 15.)  D'Alfonso testified that he thought he would be able to talk to the Government and clear up any misunderstanding using the audio tapes.  (Id. at 17-18.)

5      The written plea agreement presented to the Court at the change of plea hearing contains handwritten changes, which D'Alfonso initialed.  In response to questioning by the Court at the evidentiary hearing , D'Alfonso acknowledged that he read the agreement.  However, he denied that he ever discussed the contents of the agreement with Cooper prior to signing it.  (Id. at 32-33.)  D'Alfonso also acknowledged that the Court had conducted a full colloquy prior to accepting his guilty plea, in which he swore under oath that he read and discussed the plea agreement with counsel prior to signing it; that he heard the United States Attorney recite the terms of the plea agreement; that he told the Court that he understood the agreement; and that he understood he was giving up his trial, appellate and collateral review rights.  (Id. at 34-40.)

6      D'Alfonso admitted at the evidentiary hearing that during the plea colloquy, before answering the Court's specific question concerning whether he understood that he was waiving his right to appeal, he asked to – and actually did – consult with his attorney.  The Court's query was: "You're giving up, therefore, your right to appeal from any conviction after trial because there won't be a trial.  The only appeal that you would have from the guilty plea ordinarily would be if I imposed an illegal sentence or if there are any errors in this proceeding or the sentencing proceeding.  Do you understand that?"  D'Alfonso answered in the affirmative.  The Court then asked: "[Y]our plea

-4-

agreement contains a clause which relates to your right to appeal and may very well further restrict you right to appeal.  Do you understand that?"  At that point, D'Alfonso consulted with counsel off the record, and then responded to the Court:  "I understand now, Your Honor."  (Id. at 59.)

7        D'Alfonso testified at the evidentiary hearing that he did not understand that he could be subject to sentencing enhancements and believed he retained the right to litigate suppression issues. (Id. at 36, 38.)  He also testified that Attorney Cooper advised him that he could litigate the amount of loss involved in the crimes at the time of sentencing.  (Id. at 40-41.)  But, he claimed, Cooper did not explain that sentencing issues would be determined under a preponderance of the evidence standard.  (Id. at 41.)

8        D'Alfonso testified that, before the sentencing hearing, he wanted to withdraw his guilty plea and consulted new counsel, Elizabeth Ainslie, to assist him in doing so and to represent him at the sentencing hearing.  He asserts that Ainslie advised him not to withdraw his plea because doing so would anger the Court.  (Id. at 45-46.)  He contends that Ainslie did not tell him that, by signing the plea agreement, he had waived his appellate rights; he also testified that Ainslie gave him a notice of appeal form to sign during a recess in the sentencing hearing.  (Id. at 48-49.)  However, D'Alfonso also testified that he did not want to file an appeal.  (Id. at 50.)

9        D'Alfonso stated that he pled guilty, not because he was in fact guilty, but because he was "worn down" and "beat up over this, pretrial was breathing down my neck every minute of the day, I just wanted relief from this."  (Id. at 63.)  Asked by the Court if he was lying when he testified at the change of plea hearing that he was in fact guilty and that no one had brought pressure to bear upon him to change his plea, D'Alfonso denied that he had lied.  (Id.)

10       D'Alfonso testified that he became dissatisfied with Attorney Cooper during the plea

negotiation because he had not investigated the audio tapes and other information D'Alfonso provided to him.  Asked by the Court if he was lying when he testified at the change of plea hearing that he was satisfied with the representation of his attorney, D'Alfonso again denied that he had lied. (Id. at 77-79.)

11     Benjamin Cooper, an attorney with the Office of the Federal Defender since 1998, was D'Alfonso's attorney at the change of plea hearing.  In his career to date, he has represented 400 to 500 clients who have entered guilty pleas.  (Id. at 88.)  At least half of those clients have entered into written guilty plea agreements with the Government.  (Id. at 89.)  He has conducted between 40 and 50 jury trials.  (Id.)

12     Cooper's normal practice when considering whether a client should enter a guilty plea is to obtain discovery from the Government, send it to the client, and arrange a face to face meeting to discuss the nature of the evidence and possible defenses.  (Id.)  He also considers and discusses with his client any sentencing issues prior to advising a client on a guilty plea.  (Id. at 89-90.)

13     Contrary to D'Alfonso's testimony, Cooper testified that they met "quite a few times" in Cooper's office, spoke often by telephone, and also "had a couple of meetings outside the office" during the course of his representation.  (Id. at 91.)  He described their relationship as amicable; he testified that he tried to answer all of D'Alfonso's questions, that he had reviewed all of the discovery he obtained from the Government, as well as the audio tapes and other information he received from D'Alfonso, explained to D'Alfonso the elements of the offenses for which he was charged, and told D'Alfonso that he thought that the Government had a strong case.  (Id. at 92-94; 103; 115.)  He advised D'Alfonso that it would be in his best interest to plead guilty to limit his legal exposure at sentencing.  (Id. at 94.)  He also told D'Alfonso that the audio tapes and other

-6-

information he had about his two employees were legally irrelevant to the crimes for which he was indicted. (Id. at 116.) His efforts on D'Alfonso's behalf convinced the Government to stipulate in the plea agreement that no obstruction of justice sentencing enhancement was applicable. (Id. at 95.) The plea agreement also provided that D'Alfonso would receive a three-level reduction in the offense level for acceptance of responsibility. (Id. at 95.)

14    Cooper believed that D'Alfonso understood the nature of his guilty plea and was competent to enter it. He testified that he went over the plea agreement with D'Alfonso, who asked questions about the terms. (Id. at 97.)

15    Cooper was familiar with the waiver of appellate and collateral review rights contained in the plea agreement, and explained the waiver clause to D'Alfonso prior to his executing the agreement. (Id. at 100.) He specifically recalled discussing the waiver clause and telling D'Alfonso that his decision was "going to be final, we can't come back and say, I don't want to plead guilty anymore, I mean, it has to be – it has to be set in your mind, and this appellate-waiver provision relates to that and it relates to the sentencing as well. I said, if you lose on your downward-departure claim, you can't appeal that." (Id. at 101.)

16    D'Alfonso has a high school diploma, over two years of college training with a certificate in aviation electronics, served in the United States Marine Corps, and received training with respect to his work in the securities industry. (Id. at 71.) He has held licenses for his work in insurance and securities. (Id. at 72.)

17    The plea agreement provided that the parties stipulated "that, as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense making the defendant eligible for a 2-level downward adjustment under Guideline Section 3E1.1(a)." (Plea Agreement

¶ 4e(c).  The agreement also provided that the Government may make "whatever sentencing recommendation as to imprisonment, fines, forfeiture, restitution and other matters which the government deems appropriate" (id. ¶ 4a), as well as comment on the "circumstances of the case," and "bring to the Court's attention all facts relevant to sentencing."  (Id. ¶ 4(c).

18      The plea agreement was actively negotiated by the parties, evinced by the numerous handwritten changes to the draft presented to the Court at the change of plea hearing.  (Govt's Mot. To Dismiss Ex. A.)  For example, one of the draft provisions struck from the final version was a provision that neither party would agree not to seek a departure from the applicable sentencing guidelines range.  (Id. at 2.)

19      In the plea agreement, the parties stipulated that each was "free to argue the applicability of any other provision of the Sentencing Guidelines, including offense conduct, offense characteristics, criminal history, [and] adjustments."  (Id. at 3.)  The parties also stipulated that "these stipulations are not binding upon either the Probation Department or the Court" and that the "Court may make factual and legal determinations that differ from these stipulations and that may result in an increase or decrease in the Sentencing Guidelines range and the sentence that may be imposed."  (Id.)

20      At sentencing, the Government opposed D'Alfonso's eligibility for a § 3E1.1 downward adjustment based upon conduct of which it was unaware at the time of the plea hearing.

## III.    CONCLUSIONS OF LAW

1      A waiver of appellate rights that is entered into knowingly and voluntarily is enforceable, provided that enforcement does not amount to a miscarriage of justice.  United States v. Khattak, 273 F.3d 557, 563 (3d Cir. 2001).

2      This standard also applies to waivers of the right to collateral review.  See  United States v.

Shedrick, 493 F.3d 292, 297-98 (3d Cir. 2007).

3      To evaluate whether enforcement of a waiver would result in a miscarriage of justice, the United States Court of Appeals for the Third Circuit has cited a number of factors that must be considered, including: the clarity of the error; the gravity of the error; the character of the error; the impact of the error on the defendant; the impact of correcting the error on the Government; and the extent to which the defendant acquiesced in the result.  Khattak, 273 F.3d at 563.

4      While the miscarriage-of-justice determination is open-ended, the Third Circuit has specifically noted that enforcing a waiver where constitutionally deficient lawyering prevented a defendant from understanding a plea agreement would result in a miscarriage of justice.  Shedrick, 493 F.3d at 298.

5      In addition to the factors articulated in Khattak, a defendant who signs an appellate waiver may nonetheless appeal if the Government breaches its obligations under the plea agreement.  United States v. Moscahlaidis, 868 F.2d 1357 (3d Cir. 1989).

6      Whether the Government has violated the terms of a plea agreement is a question of law.  United States v. Wilder, 15 F.3d 1292, 1295 (3d Cir. 1994).

7      "In determining whether the terms of the plea bargain have been violated, the court must determine whether the government's conduct is consistent with the parties' reasonable understanding of the agreement."  Id. (quoting United States v. Valencia, 985 F.2d 758, 761 (5th Cir. 1993)).

8      The Government must strictly adhere to the terms of plea agreements it enters into with defendants.  United States v. Miller, 565 F2d 1273, 1274 (3d Cir. 1977).

9      D'Alfonso's waiver of appellate and collateral attack rights was entered into knowingly and voluntarily and is enforceable.  We credit the testimony of Attorney Cooper that he explained the

-9-

terms of the plea agreement, including the waiver provision, and that D'Alfonso understood the nature and consequences of his act. We do not credit the testimony of the defendant. His sworn testimony at the evidentiary hearing contradicted his previous sworn testimony at the change of plea hearing.

10    D'Alfonso's understanding of the waiver provision and the overall consequences of his actions are supported by his education, his sophisticated work history, and by the fact that before answering the Court's specific question regarding whether he understood that he was waiving his rights, he asked to and actually did consult with his attorney.

11    Attorney Cooper provided effective assistance of counsel in advising D'Alfonso whether to enter the plea agreement that included the waiver provision. We credit his testimony that he obtained and reviewed the discovery – including the material provided by D'Alfonso; met numerous times with D'Alfonso to discuss the evidence and the benefits of a plea; tried to answer all of D'Alfonso's questions; and advised him, based upon the evidence, that it would be in D'Alfonso's best interest to plead guilty to limit his legal exposure at sentencing. We also credit Cooper's testimony that he went over the plea agreement with D'Alfonso, who asked questions about its terms, that D'Alfonso understood the nature of his actions, and that he was competent to enter the plea agreement.

12    D'Alfonso has not established that the Government has breached the plea agreement. He alleged in his Reply to the Government's Motion to Dismiss that the Government had breached the plea agreement in three respects: 1) by concealing the fact that Carpino and Santosussa had both testified before the grand jury; 2) when it stipulated in the plea agreement that D'Alfonso was entitled to acceptance of responsibility points, but changed its position at sentencing; and 3) when

it sought additional sentencing enhancements not agreed to in the plea agreement.

13      The plea agreement contains no provision binding the Government to anything involving Carpino and Santosussa.  The Assistant United States Attorney's alleged statement to D'Alfonso during plea negotiations that the Government "was not interested in them," even though they had testified before the grand jury, cannot be a breach of the plea agreement.

14      The plea agreement specifically provided that the Government agreed "as of the date of this agreement" that D'Alfonso was entitled to acceptance of responsibility points.  It also provided that the Government retained the right to make a sentencing recommendation and comment on all facts relevant to sentencing.  The Government's change of position on D'Alfonso's eligibility for acceptance of responsibility points cannot be a breach of the plea agreement.

15      The plea agreement specifically permitted the Government to argue the applicability of any provision of the Sentencing Guidelines, including offense conduct, offense characteristics, criminal history, and adjustments.  Sentencing enhancements fall within this provision.  The parties also stipulated that their agreement was not binding on the Court, and that the Court could make factual and legal determinations that differed from the parties' stipulations and that could result in an increase or decrease in the sentence imposed.  The Government's assertion at sentencing that D'Alfonso was subject to enhancements based on the amount of loss involved was not a breach of the plea agreement.

16      The Government's position at sentencing was consistent with the parties' reasonable understanding of the plea agreement.

17      D'Alfonso has not established that the plea agreement is ambiguous.

18      Accordingly, D'Alfonso's waiver of his appellate and collateral attack rights is enforceable

and the Government's motion to dismiss is granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :   CRIMINAL
                :
                :
    v.            :
                :
                :
BRIAN D'ALFONSO       :   NO. 03-746

## ORDER

**AND NOW**, this 15th day of April, 2008, **IT IS HEREBY ORDERED** as follows:

1.    The Motion of the United States to Dismiss Petition under 28 U.S.C. § 2255 (Docket #93) is **GRANTED**.

2.    Defendant's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 (Docket # 80) is **DISMISSED**.

3.    Defendant's Motion to Transfer Evidence (Docket # 92) is **DISMISSED AS MOOT**.

4.    Defendant's Motion for Discovery (Docket #97) is **DISMISSED AS MOOT**.

5.    Defendant's Motion to Compel and For Injunctive Relief (Docket # 98) is **DISMISSED AS MOOT**.

6.    Defendant's Motion to Compel (Docket # 99) is **DISMISSED AS MOOT**.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.